**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**UNITED STATES OF AMERICA,**

   **Plaintiff,**

**v.**         **Docket No. 3:19CR112**
          **The Hon. David J. Novak**

**DANIEL FEILING,**

   **Respondent.**

**MEMORANDUM IN SUPPORT OF MOTION FOR COMPASSIONATE RELEASE**
**PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)**

   The defendant, Daniel Feiling, through counsel, respectfully moves this Court to

grant his motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A), and order

the remainder of his sentence to be served on home confinement.  This motion should

be granted due to the "extraordinary and compelling reasons" confronting the federal

prison system by the COVID-19 pandemic, in combination with Mr. Feiling advanced

age, 71 years old, and the fact that he suffers from narcolepsy, sleep apnea, type II

diabetes, high blood pressure, high cholesterol, an enlarged prostate, burning

sensations in his feet, obesity, shortness of breath, neuropathy in his feet, cataplexy (a

sudden and uncontrollable muscle weakness or paralysis that comes on during the day

in which, with little warning, the person loses muscle tone and can have a slack jaw,

broken speech, buckled knees or total weakness in their face, arms, legs, and trunk),

Dupuytren's contracture (an abnormal thickening and tightening of the normally elastic

tissue beneath the skin of the palm and fingers causing the fingers to curl forward and

potentially leading to crippling hand deformities), and Metabolic syndrome (a cluster of conditions that occur together, increasing your risk of heart disease, stroke and type II diabetes). (PSR ¶ 64).  Mr. Feiling is not a danger to the community, and his release to home confinement adheres to the mandates of Section 3553(a), particularly in light of the cataclysmic events of the current pandemic.  We respectfully ask the Court to consider this motion on an expedited basis as the risk to Mr. Feiling's life multiplies exponentially with each passing day.

## I.    Factual Background

Mr. Feiling pled guilty on September 6, 2019, to one count of Possession of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). In 2017, Mr. Feiling's username was detected and suspected by Homeland Security Investigations ("HSI") agents of accessing a Chatstep chat room and posting links to eight (8) images of suspected child pornography. After identifying Mr. Feiling's IP address and residence, the agents executed a search warrant at Mr. Feiling's home on March 15, 2018, and discovered several images of child pornography.

When the law enforcement agents arrived at his home, an embarrassed and ashamed Mr. Feiling admitted to viewing and downloading child pornography. He immediately accepted responsibility for his actions and did not minimize his conduct. He was not arrested but later served with a Target Letter. However, almost immediately after the execution of the search warrant, he ceased his activities and sought help.

After listening to witnesses and the arguments of counsel at the sentencing hearing, this Court granted Mr. Feiling's request for a downward variance and imposed a sentence of seventy months. (ECF 47).  In granting the request for the downward variance, the Court relied upon Mr. Feiling's prompt acceptance of responsibility, post-offense rehabilitation efforts and his lack of criminal history. (ECF 46).  The Court did not adopt Mr. Feiling's arguments concerning his age and fragile health as a basis for the downward variance.  Mr. Feiling is now incarcerated at FCI Loretto in Pennsylvania and has a projected release date of December 5, 2024.

Mr. Feiling has just recently arrived at FCI Loretto and was just meeting with his team on March 31, 2020 for the first time.  Because of the urgency of the spread of COVID-19, both nationally and within the federal prison system, we respectfully ask the Court to waive the 30-day waiting period for any response by the warden.  By the time a response is received, it could be too late.[1]

## II.      This Motion is Properly Before the Court

On December 21, 2018, the First Step Act became law. Among the criminal justice reforms, Congress amended 18 U.S.C. § 3582(c)(1)(A)(i) to provide the sentencing judge jurisdiction to consider a defense motion for reduction of sentence based on extraordinary and compelling reasons whenever "the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the

---

[1] In the alternative, we respectfully ask that the Court defer its decision for no more than 30 days.

defendant's behalf," or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" First Step Act of 2018, § 603(b), Pub. L. 115- 391, 132 Stat. 5194, 5239 (Dec. 21, 2018).

Here, while a 30-day period following the warden's receipt of a potential request by Mr. Feiling for compassionate release has not yet passed, this Court has authority to construe the exhaustion requirement as futile given the urgency of this national emergency and the rapid spread of the virus, in addition to the fact that Mr. Feiling is 71 years old and his health is poor. As noted above, he suffers from from a constellation of extraordinarily significant afflictions, including Type II Diabetes, High Blood Pressure, Sleep Apnea, Metabolic Syndrome, High Cholesterol, and Dupuytren's Contracture; however, his most serious diagnoses are his Narcolepsy with Cataplexy. Narcolepsy and Cataplexy can cause serious injury or even death to a person if he/she suddenly falls asleep or loses muscle control while performing ordinary, routine actions (i.e., walking down stairs). While at the Northern Neck Regional Jail awaiting transfer to his designated facility, Mr. Feiling had three cataplectic episodes. Two resulted in the loss of muscle control in his upper body. His third, and most serious episode, resulted in complete muscle collapse and he fell on the floor and hit his head.

As this Court will remember from the sentencing hearing, the only medication available to treat Mr. Feiling's medical condition, Zyrem, is not available on the BOP formulary, and there is no generic substitute. Mr. Feiling's treating physician of 12 years, Dr. Douglas Puryear, M.D., F.C.C.P., of Pulmonary Associates of Richmond, provided a detailed letter regarding Mr. Feiling's condition at the time of sentencing.

He explained that Narcolepsy can cause a person "to go from wakefulness directly into REM sleep without any warning" and that Cataplexy can result in "collapse, difficulties speaking, falls, and difficulties gripping objects." Dr. Puryear further explaieds that Mr. Feiling's Narcolepsy with Cataplexy has been controlled when treated with the only FDA approved medication for this condition – Xyrem.

Under section 3582(a)(1)(A), Mr. Feiling would ordinarily be required to either wait 30 days following the warden's receipt of his compassionate release request, or exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. *See* 18 U.S.C. § 3582(c)(1)(A). However, as numerous courts have already held, the Court has authority to waive these administrative exhaustion requirements, and should do so here. *See, e.g.*, *Washington v. Bur. of Prisons*, No. 1:19-CV-01066, 2019 WL 6255786, at *2 (N.D. Ohio July 3, 2019) (in addressing motion for recalculation of good time credit under the First Step Act, the court explained that "[t]he failure to exhaust administrative remedies may be excused if seeking administrative remedies would be futile."); *United States v. Walker*, No. 3:10-CR-00298-RRB-1, [Dkt. 110] (D. Or. Feb. 7, 2019) (finding that, although the defendant failed to exhaust administrative remedies, the Court had jurisdiction to order recalculation of defendant's good time credit under the First Step Act and to order defendant's release if his term of imprisonment had expired); *see also Gurzi v. Marques*, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2 (D. Minn. Oct. 10, 2019) (despite prisoner's failure to exhaust administrative remedies, addressing the merits of prisoner's objections to his designation, in part under the First Step Act, as "the Court observes that it has the authority to proceed to the merits of the case rather

than rely on a failure to exhaust when appropriate."); *United States v. Perez*, 1:94CR316 (4/1/2020 D.C.).[2]

Requiring Mr. Feiling to wait a minimum of 30 days to exhaust his administrative remedies is futile under these circumstances and could lead to irreparable harm.  Mr. Feiling seeks this emergency relief to avoid contracting COVID-19.  He faces an increased risk of contracting the virus because of the conditions of confinement in prison, where "social distancing" is impossible and disease spreads fast.  Not only does Mr. Feiling face a heightened risk of contracting the virus, but he is far more likely to suffer severe consequences—or even death—due to his underlying health conditions and age  waiting 30 days to exhaust administrative remedies completely defeats the purpose of this emergency motion, which is seeking urgent relief.  If Mr. Feiling could wait 30 days, this would not be styled as an emergency motion.  In these dire circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

In the alternative, we respectfully ask that the Court defer its decision on this motion for no more than 30 days.

## III.    Sentence Reduction Authority

This Court has authority to order Mr. Feiling's immediate release into home confinement under the compassionate release statute in 18 U.S.C. § 3582(c)(1)(A)(i) as

---

[2] Moreover, the exhaustion requirement under the First Step Act is not jurisdictional.  Like the administrative exhaustion requirements applicable to § 2241 petitions, § 3582(c)(1)(A) "lacks the sweeping and direct language that would indicate a jurisdictional bar rather than a mere codification of administrative exhaustion requirements."  *Richardson v. Goord*, 347 F.3d 431, 434 (2d Cir. 2003); *see also Atkinson v. Linaweaver*, 2013 WL5477576, at *1 (S.D.N.Y. Oct. 2, 2013) ("In a case brought pursuant to Section 2241, exhaustion . . . does not go to the Court's jurisdiction to adjudicate the dispute").

modified by the First Step Act.  Section 3582(c)(1)(A)(i) of Title 18 states in relevant part that the Court "may reduce the term of imprisonment, after considering the factors set forth in [18 U.S.C. §] 3553(a) to the extent they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]"  When enacting § 3582(c) as part of the Crime Control Act of 1984, Congress tasked the Sentencing Commission with defining the phase "extraordinary and compelling," and also required that any judicial order modifying a sentence be "consistent with applicable policy statements" issued by the Sentencing Commission. *See* 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples."); *see also* 28 U.S.C. § 992(a)(2) (the Commission shall promulgate general policy statements regarding "the sentence modification provisions set forth in section[ ] . . . 3582(c) of title 18").

The Sentencing Commission followed the directive and issued a policy statement. Importantly, though, this policy statement has not been updated to reflect changes made by the First Step Act of 2018.[3]  For example, the statement says that a court can order a compassionate release only "[u]pon motion of the Director of the Bureau of Prisons."

---

[3] Since the passage of the First Step Act, the Sentencing Commission has lacked a quorum such that it could revise the Commission's policies to reflect current law or amend the Sentencing Guidelines. *See United States v. Brown*, No. 4:05-CR-00227-1, 2019 WL 4942051 at *2 n.1 (S.D. Iowa Oct. 8, 2019) ("As district courts have noted often this year, the Sentencing Commission has not amended the Guidelines following the First Step Act and cannot do so until it again has four voting commissioners.").

*United States v. Beck*, No. 1:13-CR-186-6, 2019 WL 2716505 at *4 (M.D.N.C. June 28, 2019). This is no longer the case. Now, after the passage of the Act, a motion for modification may be brought directly by a prisoner.  *See* 18 U.S.C § 3582(c)(1)(A).

The Commission's current policy statement further sets forth the following factual considerations for determining whether compassionate release is appropriate: (i) the medical condition of the defendant (including terminal illness and other serious conditions and impairments); (ii) the age of the defendant (for those 65 and older with serious deterioration related to aging who have completed at least 10 years or 75 percent of the term of imprisonment); (iii) the family circumstances of the defendant (where a child's caregiver or spouse dies or becomes incapacitated without an alternative caregiver); and (iv) "other reasons" as determined by the BOP. U.S.S.G. § 1B1.13, Application Note 1(A). The fourth category specifically includes "an extraordinary and compelling reason other than, or in combination with," the first three. *Id*. Additionally, the commentary makes clear that the extraordinary and compelling reasons "need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1B1.13, Application Note 2. In other words, even if an "extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court, [that fact] does not preclude consideration for a [sentence] reduction." *Id.*

Mr. Feiling seeks relief under the catch-all provision in subsection iv that permits relief for an "extraordinary or compelling reason" other than or in addition to those listed by the Commission. To the extent that this catch-all provision limits relief to grounds

identified by the Bureau of Prisons, it is inconsistent with the First Step Act, which broadened the accessibility of compassionate release by enabling defendants to move the court for relief.

Several district courts have embraced this position. Attached as Exhibit 1to this memorandum is the Court's Order granting relief under 18 U.S.C. § 3582(c)(1)(A)(i) in *United States v. Kepa Maumau,* 2:08-cr-758-TC, ECF No. 1746 (D. Utah, Feb. 18, 2020). Exh. 1. In that decision, the court undertakes an extensive analysis of district court decisions from across the country on this issue, noting that no Court of Appeal has addressed it yet. The court observes that it is "join[ing] the majority of other district courts" in concluding that it has the discretion to provide the defendant with relief, "even if his situation does not directly fall within the Sentencing Commission's current policy statement." Exh. 1. at 7.  "Under the First Step Act, it is for the court, not the Director of the Bureau of Prisons, to determine whether there is an 'extraordinary and compelling reason' to reduce a sentence." *Id.* at 7-8.

The First Step Act's amendment to § 3582(c)(1)(A) reflects the congressional aim to diminish the BOP's control over compassionate release by permitting defendants to file sentence reduction motions directly with the sentencing court. The BOP's administration of the compassionate release program has long been the subject of criticism. The Department of Justice's Office of the Inspector General has repeatedly found that the program results in needless and expensive incarceration and is administered ineffectively. Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program*, at 11 (April 2013) ("The BOP does

not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered."); Department of Justice, Office of the Inspector General, *The Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, at 51 (May 2015) ("Although the BOP has revised its compassionate release policy to expand consideration for early release to aging inmates, which could help mitigate the effects of a growing aging inmate population, few aging inmates have been released under it."). Aside from the expense and inefficiency, the human costs of the BOP's stinting view of compassionate release has been documented by prisoner advocates. Human Rights Watch & Families Against Mandatory Minimums, *The Answer Is No: Too Little Compassionate Release in US Federal Prisons* (Nov. 2012).

With the enactment of the First Step Act, the authority shifted to this Court to decide whether extraordinary and compelling reasons warrant a sentence reduction in this case without deference to any administrative agency.

## IV.   The COVID-19 outbreak presents a compelling and extraordinary circumstance that warrants compassionate release for Mr. Feiling, who is a high-risk fatality patient.

### A. *COVID-19 presents a national and global emergency.*

Since January 2020, COVID-19 has spread widely in the United States. It has now been detected in all 50 states, the District of Columbia, Puerto Rico, Guam, and the U.S. Virgin Islands. *See* CDC, *COVID-19 Cases in the US*, available at https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. As of March 21, 2020, the total number of confirmed cases in the United States was 15,219, with 201 total deaths. *Id.* Five days later, as of March 26, 2020, there was a 350 percent increase

in the total number of cases and a 400 percent increase in the total number of reported deaths.  *See id.* (reporting 68,440 total cases and 994 total deaths).

As of April 3, 2020, the Bureau of Prisons reported that 75 inmates and 39 staff members tested positive for COVID-19.  *See* Fed. Bur. of Prisons, COVID-19 Tested Positive Cases, available at  https://www.bop.gov/coronavirus/.  But those numbers significantly undercount the actual number of cases within BOP facilities.  For example, the BOP website lists only 12 inmates and 4 staff as having tested positive for the coronavirus at FCC Oakdale in Louisiana.  Yet four inmates at that facility have now died of COVID-19 in the last five days.  *See* Keegan Hamilton, *4 Inmates Dead from Coronavirus as Outbreak Spirals at Louisiana Federal Prison*, Vice News (Apr. 2 2020), available at: https://www.vice.com/en_us/article/m7qdvq/4-inmates-dead-from-covid-19-as-outbreak-spirals-at-louisiana-federal-prison.  The same report states that "[a]t least 18 inmates have tested positive for the disease and are currently hospitalized," while "17 prison workers are confirmed to have COVID-19, including one who is hospitalized,"and "[a]nother 19 workers are awaiting test results."  *Id.*  This past Tuesday, the BOP also announced that an inmate at another facility, FCI Elkton, also died due to the coronavirus.[4]

These numbers are growing exponentially around the country, and almost certainly understate the problem, as the United States in general, and prisons in particular, are vastly behind where they need to be in testing for this virus.  Given the

---

[4] https://www.bop.gov/resources/news/pdfs/20200402_press_release_elk.pdf.

rapid onset of symptoms and the fact that many people are asymptomatic at the outset, the unfortunate reality is that once one inmate tests positive for the coronvirus, it may be too late to avoid a widespread outbreak of the virus within a facility amongst both staff and inmates.

B.   _Mr. Feiling faces a significantly higher risk of contracting COVID-19 because of the conditions of confinement._

Mr. Feiling faces significant risk from the pandemic because "[j]ails are often crowded, unsanitary, and dangerous places." _Florence v. Bd. of Chosen Freeholders of Cty. of Burlington_, 566 U.S. 318, 333 (2012). "The admission of inmates creates numerous risks for facility staff, for the existing detainee population, and for a new detainee himself or herself . . . . The danger of introducing lice or contagious infections, for example, is well documented." _Id._ at 330-31. For these reasons, conditions of confinement create the ideal environment for the transmission of contagious disease.[5] In other words, "[p]risons are petri dishes for contagious respiratory illnesses."[6]

As the Court is aware, inmates cycle in and out of jails and prisons, and people who work in the facilities leave and return daily, without screening. Many people who are incarcerated also have chronic conditions, like diabetes or HIV, which makes them vulnerable to severe forms of COVID-19. According to public health experts,

---

[5] Joseph A. Bick (2007). Infection Control in Jails and Prisons. _Clinical Infectious Diseases_ 45(8):1047-1055, _at_ https://doi.org/10.1086/521910.

[6] _Letters to the Editor: A prison doctor's stark warning on coronavirus, jails and prisons_, Los Angeles Times (Mar. 20, 2020), at https://www.latimes.com/california/story/2020-03-20/prison-doctors-stark-warning-on-coronavirus-and-incarceration.

incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings."[7]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases.[8]  The conditions of confinement not only affect incarcerated individuals, but also the community at large.  "With 2.3 million people in the United States in prison or jail on any given day, an outbreak in these facilities poses a threat to the entire country."[9]

Given what is known about COVID-19, attempts to contain the infection within jail facilities seem futile.  Coronavirus is highly contagious.  On average, one person with the coronavirus will infect between two to three other individuals.[10]  The response to this situation has been unprecedented.  For instance, members of Congress have written to the Bureau of Prisons to urge that efforts be made to allow immediate release of non-

---

[7] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), *at* https://bit.ly/2W9V6oS.

[8] *Prisons and Jails are Vulnerable to COVID-19 Outbreaks*, The Verge (Mar. 7, 2020) *at* https://bit.ly/2TNcNZY.

[9] *Explainer: Prisons and Jails Are Particularly Vulnerable to COVID)-19 Outbreaks*, The Justice Collaborative, available at https://thejusticecollaborative.com/wpcontent/uploads/2020/03/TJCVulnerabilityofPrisonsandJailstoCOVID19Explainer.pdf.

[10] *The average coronavirus patient infects at least 2 others, suggesting the virus is far more contagious than flu*, Business Insider (Mar. 17, 2020), at https://www.businessinsider.com/coronavirus-contagious-r-naught-average-patient-spread-2020-3; *see also* https://www.nytimes.com/2020/03/23/us/coronavirus-westport-connecticut-party-zero.html (highlighting how quickly the virus spreads in close environments).

violent, elderly inmates.[11]   The Attorney General issued a memorandum to ensure that the BOP "utilize home confinement, where appropriate, to protect the health and safety of BOP personnel and the people in [BOP] custody." Exh. 2  (Mar. 26, 2020 Memorandum for Director of Bureau of Prisons).  On March 30, 2020, the governor of Virginia issued a statewide "stay at home order," directing all Virginians to remain in their homes, with limited exceptions, until June 10, 2020.

Courts too have taken substantial steps to respond to this crisis.  This Court, in particular, has issued a series of general orders recognizing the serious risk posed by COVID-19 and implementing unprecedented measures to minimize the spread of the virus, such as restricting visitors and closing portions of the courthouse, postponing deadlines, continuing all criminal matters, and tolling the speedy trial clock, for example.  Federal courts around the country are granting release to criminal defendants pre-trial and pre-sentencing, in addition to allowing delayed self-reports to prison, all in response to the COVID-19 pandemic.[12]

---

[11] Letter of Representatives Jerrold Nadler and Karen Bass (March 19, 2020) ("DOJ and BOP must also do all they can to release as many people as possible who are currently behind bars and at risk of getting sick.  Pursuant to 18 U.S.C. § 3582(c)(1)(A), the Director of the Bureau of Prisons may move the court to reduce an inmate's term of imprisonment for "extraordinary and compelling reasons.").

[12] See *Xochihua-James v. Barr*, No. 18-71460 (9th Cir. Mar. 23, 2020) (unpublished) (*sua sponte* releasing detainee from immigration detention "[I]n light of the rapidly escalating public health crisis");  *United States v. Meekins*, Case No. 1:18-cr-222-APM, Dkt. No. 75 (D.D.C. Mar. 31, 2020) (post-plea, pre-sentence release order releasing defendant with three pending assault charges due to extraordinary danger COVID-19 poses to individuals in detention); *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time); *United States v. Bolston*, Case No. 1:18-cr-382-MLB, Dkt. No. 20 (N.D. Ga. Mar. 30, 2020) (releasing defendant in part because "the danger inherent in his continued incarceration at the R.A. Deyton Detention Facility . . . during the COVID-19

outbreak justif[y] his immediate release from custody"); *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to individuals in prison); *United States v. Grobman*, No. 18-cr-20989, Dkt. No. 397 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release and "is *necessary* for Defendant to prepare his pre-sentence defense"); *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); *United States v. Garlock*, No. 18-CR-00418-VC-1, 2020 WL 1439980, at *1 (N.D. Cal. Mar. 25, 2020) (citing "chaos" inside federal prisons in sua sponte extending time to self-surrender: "[b]y now it almost goes without saying that we should not be adding to the prison population during the COVID-19 pandemic if it can be avoided"); *United States v. Perez*, No. 19 CR. 297 (PAE), 2020 WL 1329225, at *1 (S.D.N.Y. Mar. 19, 2020) (releasing defendant due to the "heightened risk of dangerous complications should he contract COVID-19"); *United States v. Stephens*, 2020 WL 1295155, __F. Supp. 3d__ (S.D.N.Y. Mar. 19, 2020) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic"); *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail."); *see also United States v. Avenatti*, No. 8:19-cr-61 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"); *United States v. Matthaei*, No. 1:19-CV-00243-BLW, 2020 WL 1443227, at *1 (D. Idaho Mar. 16, 2020) (extending self-surrender date by 90 days in light of COVID-19); *United States v. Barkman*, 2020 U.S. Dist. LEXIS 45628 (D. Nev. Mar. 17, 2020) (suspending intermittent confinement because "[t]here is a pandemic that poses a direct risk if Mr. Barkman . . . is admitted to the inmate population of the Wahoe County Detention Facility");

In the context of compassionate release, courts around the country have considered a defendant's vulnerability to COVID-19 in deciding whether there is an "extraordinary and compelling reason" in favor of compassionate release.[13]   In other words, the Court was unable to appreciate at Mr. Feiling's sentencing hearing the significant risk of harm, including death, that he faces from the spread of the coronavirus within the BOP facility where he is housed.   That prospect significantly alters the sentencing calculus, was not what Congress or the Court intended at his sentencing, and weighs strongly in favor of releasing him now.

---

*United States v. Underwood*, Case No. 8:18-cr-201-TDC, Dkt. No. 179 (Mar. 31, 2020) (encouraging release to furlough of elderly defendant in BOP custody because, even though no positive of COVID-19 in his facility, "there is significant potential for it to enter the prison in the near future").

[13] *See, e.g., United States v. Copeland*, Case No. 2:05-CR-135-DCN (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments defendant has during this current pandemic"); *United States v. Damian Campagna*, 2020 WL 1489829 (S.D.N.Y. Mar. 27, 2020) (finding that a defendant's compromised immune system, in concert with the COVID-19 public health crisis, constitutes an "extraordinary and compelling reason" to modify sentence); *United States v. Powell*, Case No. 1:94-CR-316-ESH, Dkt. No. 98 (D.D.C. Mar. 28, 2020) (granting unopposed motion for compassionate release in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust administrative remedies in light of an open misdemeanor case); *United States v. Marin*, Case No. 15-CR-252, Dkt. No. 1326 (E.D.N.Y. Mar. 30, 2020) (granting compassionate release for the reasons stated in [defendant's] motion, including his advanced age, significantly deteriorating health, elevated risk of dire health consequences due to the current COVID-19 outbreak, status as a non-violent offender, and service of 80% of his original sentence."); *United States v. Muniz*, Case No. 4:09-CR-199, Dkt. No. 578 (S.D. Tex. Mar. 30, 2020) (releasing defendant serving 188-month sentence for drug conspiracy in light of COVID-19, finding that "while the Court is aware of the measures taken by the Federal Bureau of Prisons, news reports of the virus's spread in detention centers within the United States and beyond our borders in China and Iran demonstrate that individuals housed within our prison systems nonetheless remain particularly vulnerable to infection.").

C. *Mr. Feiling is more likely to suffer severe or fatal effects of COVID-19 because of his age and/or health conditions.*

Older individuals and people with preexisting health issues are particularly at risk of experiencing severe side effects or death as a result of this virus.  According to the CDC, the following groups are at high risk for severe illness from COVID-19: (1) people aged 65 and older; (2) people who live in a nursing home or long-term care facility; (3) people with high-risk conditions, such as chronic lung disease or moderate to severe asthma, serious heart conditions, people who are immunocompromised,[14] obese, or have diabetes, renal failure, or liver disease.  *See* CDC, *People Who are at Higher Risk*, available at https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/people-at-higher-risk.html.

Mr. Feiling is 71 years old, and many of his conditions place him in a high risk category for COVID-19 according to the CDC.  He suffers from narcolepsy; sleep apnea; type II diabetes; high blood pressure; high cholesterol; an enlarged prostate; burning sensations in his feet; obesity; shortness of breath; neuropathy in his feet; Cataplexy (A sudden and uncontrollable muscle weakness or paralysis that comes on during the day and is often triggered by a strong emotion, such as excitement or laughter. Without much warning, the person loses muscle tone and can have a slack jaw, broken speech, buckled knees or total weakness in their face, arms, legs, and trunk.); Dupuytren's

---

[14] Many conditions can cause a person to be immunocompromised, including cancer treatment, smoking, bone marrow or organ transplantation, immune deficiencies, poorly controlled HIV or AIDS, and prolonged use of cortisteroids and other immune weakening medications. *Id.*

contracture (An abnormal thickening and tightening of the normally elastic tissue beneath the skin of the palm and fingers. This tissue is called fascia. The fascia contains strands of fibers, like cords, that run from the palm upward into the fingers. In Dupuytren's contracture, these cords tighten, or contract, causing the fingers to curl forward. In severe cases, it can lead to crippling hand deformities.); and Metabolic syndrome (a cluster of conditions that occur together, increasing your risk of heart disease, stroke and type II diabetes. These conditions include increased blood pressure, high blood sugar, excess body fat around the waist, and abnormal cholesterol or triglyceride levels. (PSR ¶ 64).

In addition, Mr. Feiling related to counsel that there is no hand sanitizer available to the inmates and air circulation is very poor. Soap is only available if one can purchase it from the prison's commissary.  In fact, the dispensers in the communal bathrooms remain empty.  And, while the facility has segregated the six housing units for meals, Mr. Feiling's housing unit of approximately 100 people continue to eat together, sit next to each other and across from each other during meals.  He is in a pod area with six other inmates in bunk beds, separated from other bunk beds by partial walls.  There are communal areas still available to inmates including, the common room, cafeteria and chapel.

**V. Releasing Mr. Feiling to home confinement is appropriate given Mr. Feiling's history and characteristics and his rehabilitation while incarcerated.**

In determining whether Mr. Feiling's sentence should be reduced based on an "extraordinary and compelling reason," this Court must consider whether Mr. Feiling

presents a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g).  *See* U.S.S.G. § 1B1.13(2). Finally, under the present statutory regime, the existence of extraordinary and compelling circumstances confers on this Court the authority to consider the relevant 18 U.S.C. § 3553(a) factors in determining whether a sentence reduction is appropriate. *United States v. Cantu-Rivera,* No. H89-204, 2019 WL 2578272 at *2 n.1 (S.D. Tex. June 24, 2019) (the court considered rehabilitation and the "unwarranted [sentencing] disparities among defendants" in determining resentencing was appropriate).

A. *Mr. Feiling is not a danger.*

In addressing a defendant's potential danger to the community, courts have found that granting the release of a criminal defendant in certain circumstances better ensures public safety by decreasing the prison population.  In a recent decision, the district court found that the "'physical and mental health' factor cuts in favor of release for any defendant during this public health crisis."  *See, e.g., United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) ("If released, Davis will be removed from a custodial setting where the risk of infection is higher for everyone, including the healthy, and he will live in the community where he is able to practice social distancing, self-quarantine, self-isolate if infected, and seek medical treatment if necessary.").[15]  The

---

[15] *See also United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, *see* 18 U.S.C. § 3142(e), but tilts the balance in favor of release."); *United States v. Michaels*, 8:16-cr-76-JVS, Minute Order, dkt. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling

release of Mr. Feiling does not present a danger to the public; on the contrary, it only serves to further public safety.

Setting aside COVID-19, Mr. Feiling is an ideal candidate for release.  Mr. Feiling was originally served with a target letter.  He remained in the community for over a year and sought out help from his pastor and a sex offender mental health specialist.  Once he was charged he was place on pretrial supervision with an electronic monitor and was in full compliance with the terms of his release. In fact, the Court acknowledged his outstanding post-offense rehabilitation at the time of sentencing, and hear testimony from his pastor and considered the evaluation from his sex offender treatment provider confirming that he was unlikely to re-offend.

Finally, Mr. Feiling has strong support in the community. This will be essential to his successful reintegration to society upon release.  He has maintained close ties with his wife, children and his pastor.  Backed by this support, and in light of his history, there is no reason to believe Mr. Feiling would present a danger to society.

B. *The § 3553(a) factors and Mr. Feiling's rehabilitation weigh in favor of relief.*

---

reason'" justifying temporary release under § 3142(i).); *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun & drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources"; "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement"); *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

As previously stated, the underlying charge is Mr. Feiling's only legal encounter. He has led an otherwise normal life and experienced a rewarding career. This transgression has all but ruined that. He has brought shame and humiliation upon himself, placed his marriage at risk, and possibly caused irreparable damage to his family's trust in him, forcing them to question his judgment and character. This fact is not lost upon Mr. Feiling and the weight of his guilt has affected him deeply. His health has continued to deteriorate.

As stated in the PSR, Mr. Feiling's children live in Ohio and South Carolina (PSR ¶¶ 59-60).  Mrs. Feiling is currently in Ohio with her daughter, but has been able, with the assistance of her children, to continue to pay the mortgage on the house in Richmond.

C.  *Mr. Feiling has a viable release plan.*

Each day in custody is increasingly risky for Mr. Feiling.  Mr. Feiling has no way to practice "social distancing" or other protectives measures that are mandated by health officials throughout the nation and which promise some hope of surviving the consequences of infection. When more inmates get sick, there will be fewer infirmary beds and greater risk of contracting the virus. When the medical staff becomes ill, there will be fewer people to provide care. And when the correctional staff gets sick, there will be fewer officers available to bring sick people to the infirmary, hospital, or even just keep an eye on who is showing signs of illness. The combination of lack of adequate sanitation, close quarters, and limited medical capacity create the perfect storm. This storm is especially dangerous for people like Mr. Feiling who, because of complex medical issues,

many that are listed by the CDC, is particularly susceptible to contracting a life threatening illness and being unable to survive it.

Mr. Feiling will be able to return to his home in Richmond, and seek guidance and care from his long time treating physician Dr. Puryear.  This release plan will adequately address the concerns presented by COVID-19, protect the public, and ensure his successful transition into the community.  He can continue to receive his social security income on which he was living prior to his incarceration.

## CONCLUSION

Mr. Feiling respectfully requests that this Court order his immediate compassionate release and impose the following supervised release conditions previously set by this Court to include electronic monitoring.

Respectfully submitted,

_____/s/_____
Mary E. Maguire
VSB No. 42505
Assistant Federal Public Defender
Attorney for Daniel Feiling
Office of the Federal Public Defender
701  East Broad Street, Suite. 3600
Richmond, Virginia 23219
Telephone: 804 -565-0860
Telefax: 804-643-5033
Email: Mary_Maguire@fd.org

## **CERTIFICATE OF SERVICE**

I certify that on this 3rd day of April, 2020, I electronically filed the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notification (NEF)

to:

Kaitlin Cooke
Heather Mansfield
Assistant United States Attorneys
Office of the United States Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Email: Kaitlin.Cooke@usdoj.go
        Heather.Mansefield@usdoj.gov


        _____/s/_____
        Mary E. Maguire
        VSB No. 42505
        Assistant Federal Public Defender
        Attorney for Daniel Feiling
        Office of the Federal Public Defender
        701 East Broad Street, Suite. 3600
        Richmond, Virginia 23219
        Telephone: 804 -565-0860
        Telefax: 804-643-5033
        Email: Mary_Maguire@fd.org