IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

UNITED STATES OF AMERICA,

    v.                                                          Criminal No. 3:19cr112 (DJN)

DANIEL FEILING,
Defendant.

**MEMORANDUM OPINION**

On August 13, 2019, the Government filed a criminal information against Defendant Daniel Feiling ("Defendant") charging him with one count of possession of child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). On September 6, 2019, Defendant waived his right to indictment and pled guilty to the charges against him. On December 17, 2019, the Court sentenced Defendant to seventy months' imprisonment, with five years of supervised release, a $100 special assessment and mandatory restitution.

Following the outbreak of Coronavirus Disease 2019 ("COVID-19"), on April 3, 2020, Defendant filed his first Motion for Compassionate Release ("First Motion") (ECF No. 53), moving pursuant to 18 U.S.C. § 3582(c)(1)(A) to serve the remainder of his sentence on home confinement in light of his age, medical conditions and the outbreak of COVID-19. On April 10, 2020, the Court issued a Memorandum Opinion (ECF No. 56) and Order (ECF No. 57) denying Defendant's First Motion for failure to exhaust administrative remedies before the Bureau of Prisons ("BOP"). The Court also found that Defendant had not presented extraordinary and compelling reasons for his release or demonstrated that home confinement constituted a viable alternative sentence.

This matter now comes before the Court on Defendant's Second Motion for Compassionate Release ("Second Motion") (ECF No. 58), again moving pursuant to § 3582(c)(1)(A) to serve the remainder of his sentence on home confinement in light of his age, medical conditions, the outbreak of COVID-19 and his desire to care for his wife. For the reasons set forth below, the Court DENIES Defendant's Second Motion (ECF No. 58).

## I. BACKGROUND

### A. Defendant's Criminal Conduct

In 2017, law enforcement agents with Homeland Security Investigations ("HSI") learned that an individual with the username "Dan" had accessed a chatroom on the website Chatstep and posted links to eight image files depicting suspected child pornography. (Statement of Facts ("SOF") (ECF No. 11) ¶ 2.) HSI agents tracked the username "Dan" to an internet-protocol address assigned to Defendant's residence.[1] (SOF ¶ 3.) Based on this information, on March 15, 2018, HSI agents executed a search warrant at Defendant's residence. (SOF ¶ 4.)

While executing the warrant, agents spoke with Defendant and he admitted to downloading child pornography from the internet. (SOF ¶ 4.) Agents also obtained several electronic devices, including a sixteen-gigabyte thumb drive. (SOF ¶ 5.) A forensic examination of the thumb drive revealed over one thousand images of minors engaged in explicit conduct as defined in 18 U.S.C. § 2256(2)(A). (SOF ¶ 6.)

### B. Procedural History

On May 1, 2018, Defendant appeared before the undersigned after receiving a target letter notifying him of the potential charges against him. (ECF No. 1.) During this hearing, the

---

[1] An IP address represents the ten-digit "identification tag used by computers to locate specific websites." *Internet-Protocol Address*, Black's Law Dictionary (11th ed. 2019).

2

Court appointed counsel for Defendant and advised him of his rights. (ECF No. 1.) Over a year later, on August 13, 2019, the Government filed a criminal information charging Defendant with one count of possession of child pornography. (ECF No. 3.)

On September 6, 2019, Defendant appeared before the undersigned for his initial appearance, arraignment and plea hearing, during which Defendant waived his right to indictment and pled guilty to Count One of the Criminal Information. (ECF Nos. 7, 9.) The Court then scheduled this matter for sentencing on November 21, 2019, before Senior United States District Judge Robert E. Payne. (ECF No. 7.) On October 24, 2019, Judge Payne reassigned this case to the undersigned upon the undersigned's confirmation and appointment as a United States District Judge. (ECF No. 25.) Following reassignment, the Court scheduled this matter for sentencing on December 17, 2019. (ECF No. 26.)

On November 26, 2019, the Probation Officer filed his Presentence Investigation Report, which calculated the guidelines range for Defendant's sentence as 97-120 months' imprisonment based on an offense level of 30 and a criminal history category I. (Presentence Investigation Rep. ("PSR") (ECF No. 27) at 17.) On December 3, 2019, Defendant filed his Position on Sentencing, which agreed with the Probation Officer's guidelines calculation and requested a sentence of probation or home confinement followed by five years of supervised release. (Def.'s Pos. on Sentencing ("Def.'s Pos.") (ECF No. 30) at 1.) Defendant argued that a sentence of home confinement or probation satisfied the § 3553(a) factors, because Defendant had led an otherwise law-abiding life, is of an advanced age (seventy-one), suffers from several medical conditions and had sought out treatment and counseling following notice of the charges against him. (Def.'s Pos. at 3-7.)

3

On December 3, 2019, the Government filed its Position on Sentencing, which also agreed with the Probation Officer's guidelines calculation and requested that the Court impose a sentence within that range. (Pos. of U.S. With Respect to Sentencing ("Gov't Pos.") (ECF No. 31) at 1.) The Government argued that the nature and circumstances of Defendant's offense weighed heavily in favor of a sentence within the guidelines range, noting that eight victims had come forward to describe the harm caused by Defendant's conduct. (Gov't Pos. at 5-9.) The Government maintained that Defendant's age only highlighted his understanding of the wrongfulness of his conduct. (Gov't Pos. at 9.) The Government further noted that Defendant had also distributed illicit content despite being charged with only possessing it, meaning the guidelines range already undervalued the seriousness of Defendant's conduct. (Gov't Pos. at 12.) And although Defendant suffers from several physical ailments, the Government contended that he suffered from no mental impairments that could excuse his conduct. (Gov't Pos. at 10.)

The above notwithstanding, along with its Position on Sentencing, the Government moved for an additional one-level reduction in Defendant's offense level for acceptance of responsibility, because Defendant "assisted authorities in the investigation and prosecution of his own misconduct by timely notifying the United States of [his] intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the Untied States and the [C]ourt to allocate their resources efficiently." (Mot. of U.S. to Grant Additional One-Level Reduction in the Offense Level (ECF No. 32) at 1.) The Court granted this Motion.

On December 17, 2019, Defendant appeared before the Court for sentencing. (ECF No. 44.) After considering the parties' arguments, the Court granted a downward variance from the guidelines range based on Defendant's acceptance of responsibility, post-arrest rehabilitation efforts and lack of criminal history. (Statement of Reasons ("SOR") (ECF No. 46) at 3.)

However, based on the nature and circumstances of Defendant's offense, including the timespan of the offense and the number of illicit images and videos in his possession, the strong public policy against child pornography offenses, the need to provide adequate deterrence and protect the public from further crimes by Defendant and Defendant's need for treatment, the Court imposed a sentence of seventy months' imprisonment with five years of supervised release, mandatory mental health and sex offender treatment, a $100 special assessment and mandatory restitution. (SOR at 3; Judgment (ECF No. 47).) Notably, the Court reasoned that a sentence of home confinement would not adequately deter Defendant or prevent the commission of further crimes of a similar nature, because Defendant committed the instant offense while at home. (SOR at 3.)

### C. Defendant's First Motion for Compassionate Release

Shortly after Defendant began serving his term of imprisonment, the first cases of COVID-19 emerged in the United States, including within the federal prison system. *See* Fed. Bureau of Prisons, COVID-19 Coronavirus (Apr. 10, 2020), www.bop.gov/coronavirus (showing updated figures on the number of inmates and prison staff who have tested positive for COVID-19). In response, on April 3, 2020, Defendant moved for compassionate release pursuant to § 3582(c)(1)(A), requesting that the Court permit him to serve the remainder of his prison sentence on home confinement. (Mem. in Supp. of Mot. for Compassionate Release ("Def.'s 1st Mot.") (ECF No. 53) at 1.)

Specifically, Defendant argued that he should be released on home confinement, because his advanced age and health conditions rendered him particularly vulnerable to COVID-19. (Def.'s 1st Mot. at 1, 10-18.) Defendant maintained that prisons are inherently unsanitary and crowded, which increases the likelihood that he would contract COVID-19 while incarcerated.

5

(Def.'s 1st Mot. at 12-16.) Defendant also argued that his age and medical conditions only increase his susceptibility to the disease, because several of those conditions, including diabetes, high blood pressure, obesity, respiratory issues and metabolic syndrome, have been identified by the Centers for Disease Control and Prevention ("CDC") as factors most likely to cause COVID-19 complications. (Def.'s 1st Mot. at 17-18.)

As for § 3582(c)(1)(A)'s requirement that inmates first exhaust administrative remedies before moving for compassionate release in court, Defendant argued that the Court should find administrative exhaustion futile "given the urgency of this national emergency and the rapid spread of the virus, in addition to the fact that [Defendant] is 71 years old and his health is poor." (Def.'s 1st Mot. at 4.) Because Defendant remains at high risk of contracting and suffering the worst consequences of COVID-19, he requested that the Court waive the administrative exhaustion requirement. (Def.'s 1st Mot. at 6.)

### D. The Court's Denial of Defendant's First Motion

After ordering an expedited response from the Government, on April 10, 2020, the Court issued a Memorandum Opinion (ECF No. 56) and Order (ECF No. 57) denying Defendant's First Motion (ECF No. 53). In so ruling, the Court held that "the mere existence of COVID-19 among the prison population and an inmate's susceptibility to it do not justify waiver of the administrative exhaustion requirement under § 3582(c)(1)(A)." *United States v. Feiling (Feiling I)*, __ F. Supp. 3d __, 2020 WL 1821457, at *5 (E.D. Va. Apr. 10, 2020). The Court reasoned that the BOP had already taken steps to seriously consider home confinement for at-risk inmates and stood in the best position to consider the myriad factors that go into a home confinement decision. *Id.* at *5-6. Accordingly, the Court denied Defendant's First Motion for failure to exhaust his administrative remedies. *Id.* at *7.

Relevant here, the Court also found that Defendant's First Motion failed on the merits. *Id.* at *7-8. Specifically, the Court found that Defendant had not presented extraordinary and compelling reasons for his release on home confinement, because "[a]lthough Defendant list[ed] multiple medical conditions that establish[ed] a particularized susceptibility to COVID-19, . . . he fail[ed] to demonstrate a particularized risk of contracting the disease," noting that Defendant's prison facility, FCI Loretto, had no confirmed cases of COVID-19 at that time. *Id.* at *7. And even if COVID-19 cases eventually emerged at FCI Loretto, the Court held that Defendant had not established home confinement as "a viable alternative sentence," because his proposed release plan would require his at-risk wife to increase her exposure to COVID-19 to obtain necessary provisions and would release Defendant to the Richmond area, where COVID-19 proved far more prevalent. *Id.* at *8.

Finally, the Court opined that Defendant's release on home confinement would also undermine the relevant justifications for his sentence under § 3553(a), because: "(1) Defendant committed his instant offense while at home, meaning a term of home confinement would be less likely to protect the public; and, (2) Defendant's sentence needed to reflect the seriousness of his offense and the compelling public policy against the sexual exploitation of children." *Id.*

### E.  Defendant's Second Motion for Compassionate Release

Following the Court's denial of his First Motion, Defendant exhausted his administrative remedies before the BOP and, after the BOP denied his request for release, filed his Second Motion for Compassionate Release (ECF No. 58) on July 29, 2020. In support of his Second Motion, Defendant raises three main reasons for his release on home confinement.

First, Defendant argues that his health conditions have continued to deteriorate during his incarceration, "warranting his compassionate release on either medical grounds or under the

7

catch-all provision [of § 1B1.13 of the United States Sentencing Guidelines]." (2d Mot. & Mem. in Supp. of Mot. for Compassionate Release ("Def.'s 2d Mot.") (ECF No. 58) at 6 (citing USSG § 1B1.13, application notes 1(A)(ii)(1), 1(D)).) Of his medical conditions, Defendant cites to narcolepsy with cataplexy as his most serious, noting that the BOP does not carry the only FDA-approved medication to treat his narcolepsy, which has caused him to experience several cataplectic episodes while incarcerated. (Def.'s 2d Mot. at 7.) And Defendant avers that prison officials recently removed his continuous positive airway pressure ("CPAP") machine from his cell unless he agreed to go into isolation, making it difficult for Defendant to manage his sleep apnea. (Def.'s 2d Mot. at 7.) Defendant contends that his medical conditions, alone, provide an extraordinary and compelling reason for his compassionate release, without considering Defendant's susceptibility to COVID-19. (Def.'s 2d Mot. at 7-10.)

Nonetheless, Defendant also argues that his medical conditions render him particularly susceptible to COVID-19, further justifying his release. In support of this contention, Defendant cites to several cases in which courts have released inmates suffering from at least one COVID-19 risk factor. (Def.'s 2d Mot. at 8 n.8 (collecting cases).) Defendant maintains that his type II diabetes, hypertension, obesity and heart issues all render him particularly vulnerable to COVID-19, justifying his release on home confinement. (Def.'s 2d Mot. at 10-16.)

As for Defendant's risk of contracting COVID-19, Defendant points out that ten inmates and six staff members at FCI Loretto have tested positive for COVID-19 since the Court's April 10, 2020 Memorandum Opinion. (Def.'s 2d Mot. at 19.) Defendant argues that these numbers understate the prevalence of COVID-19 at FCI Loretto, because asymptomatic individuals can also contract and spread the disease. (Def.'s 2d Mot. at 19.) Defendant asserts that FCI Loretto has not maintained social distancing, enforced face mask requirements or restricted social

gatherings between inmates, creating a particularized risk that Defendant will contract COVID-19 while incarcerated. (Def.'s 2d Mot. at 21.)

Finally, Defendant contends that his wife's deteriorating health provides further justification for his compassionate release. (Def.'s 2d Mot. at 16-17.) Defendant notes that his wife has stage IV adenocarcinoma, which has spread to her lungs, liver and abdomen. (Def.'s 2d Mot. at 16.) Defendant avers that his wife lives alone, without the support of her and Defendant's children, both of whom live out of state. (Def.'s 2d Mot. at 16.) Based on these circumstances, Defendant argues that compassionate release should be granted "so that he can care for and comfort his wife of 30 years." (Def.'s 2d Mot. at 17.)

No matter the reasons for his release, Defendant argues that home confinement presents a viable alternative sentence, because although his wife would be the only individual in the household capable of leaving to obtain necessities, increasing her exposure to COVID-19, he and his wife intend to use home delivery services to avoid contact with others. (Def.'s 2d Mot. at 21-22.) Further, although the Richmond area has a higher absolute number of confirmed COVID-19 cases, Defendant emphasizes that FCI Loretto has a 7 percent higher number of per capita confirmed cases. (Def.'s 2d Mot. at 22-23.) And Defendant notes that the BOP's inmate population has a much higher positivity rate (approximately 29.2 percent) than either the nation (8.6 percent) or Virginia (7.9 percent). (Def.'s 2d Mot. at 23.) Based on these statistics, Defendant contends that home confinement presents a much safer sentence for Defendant and the public. (Def.'s 2d Mot. at 23.)

Moreover, Defendant argues that the relevant § 3553(a) factors support his release on home confinement, because Defendant has already felt the shame and humiliation associated with his offense and has no intention of downloading or viewing child pornography again.

9

(Def.'s 2d Mot. at 24.) Defendant also contends that computer and location monitoring would adequately protect the public while he remains on home confinement, noting that he satisfied similar conditions while on pretrial release. (Def.'s 2d Mot. at 24.)

The Government filed its Response to Defendant's Second Motion on August 7, 2020, (U.S.' Resp. in Opp. to Def.'s 2d Mot. for Compassionate Release ("Gov't Resp.") (ECF No. 62)), and Defendant filed his Reply on August 11, 2020, (Def.'s Reply in Supp. of 2d Mot. for Compassionate Release (ECF No. 66)), rendering Defendant's Second Motion now ripe for review.[2]

## II. ANALYSIS

Because the Government concedes that Defendant has exhausted his administrative remedies under § 3582(c)(1)(A), the Court will proceed to consider whether Defendant has presented extraordinary and compelling reasons for his release on home confinement. (Gov't Resp. at 11.) To that end, as mentioned, Defendant presents three reasons for his compassionate release, namely: (1) his medical conditions; (2) his particularized susceptibility to COVID-19 and his particularized risk of contracting the disease at FCI Loretto; and, (3) his wife's ailing health and need for a caregiver. (Def.'s 2d Mot. at 6-21.) The Court will first address whether these reasons, either singly or in combination, constitute extraordinary and compelling reasons for Defendant's release on home confinement, before considering whether home confinement presents a viable alternative sentence.

---

[2] Although the Court previously ruled on nearly identical arguments to those now made in Defendant's Second Motion, because § 3582 does not limit the number of compassionate release motions that an inmate may file, and because the Court did not have jurisdiction to rule on the merits of Defendant's First Motion, the Court will consider Defendant's Second Motion.

### A. Defendant's Medical Conditions, Alone, Do Not Provide Extraordinary and Compelling Reasons for His Release.

Defendant first argues that the Court should release him on home confinement, because he suffers from several medical conditions that "warrant[] his compassionate release on either medical grounds or under the catch-all provision [of § 1B1.13 of the United States Sentencing Guidelines]." (Def.'s 2d Mot. at 6 (citing USSG § 1B1.13, application notes 1(A)(ii)(1), 1(D)).) Specifically, Defendant cites to several diagnosed conditions, including type II diabetes, hypertension, sleep apnea, metabolic syndrome, high cholesterol, gastroesophageal reflux disease, Dupuytren contracture[3] and narcolepsy with cataplexy. (Def.'s 2d Mot. at 6-7.) Of these, Defendant avers that his narcolepsy with cataplexy has become the most serious, because the BOP does not carry the only FDA-approved medication for his condition. (Def.'s 2d Mot. at 7.) As a result, Defendant asserts that he has experienced several cataplectic episodes while incarcerated, causing him to "seize up" and lose mobility. (Def.'s 2d Mot. at 7.) And Defendant also asserts that his sleep apnea has gone untreated after prison officials removed his CPAP machine from his cell, precluding him from using the machine unless he agreed to go into isolation. (Def.'s 2d Mot. at 7.)

The Government responds that Defendant has received adequate medical care within the BOP such that his medical conditions do not provide a compelling justification for his release. (Gov't Resp. at 12.) Indeed, the Government points out that Defendant's own argument concedes that he had a CPAP machine for his sleep apnea until he refused to go into isolation to further protect himself from COVID-19. (Gov't Resp. at 12-13.) And the Government also

---

[3] Dupuytren contracture denotes a condition whereby a finger or fingers contract and stiffen due to a shortening and thickening of the fascia tissue in the palm of the hand. The condition often coincides with epilepsy. *Contracture, Dupuytren c.*, Dorland's Illustrated Medical Dictionary (32d ed. 2012).

11

points out that Defendant underwent an echocardiogram while incarcerated, further demonstrating the BOP's proactive approach to Defendant's medical conditions. (Gov't Resp. at 13.) Because the BOP has been able to adequately manage and address Defendant's healthcare needs, the Government contends that Defendant's medical conditions do not, alone, constitute an extraordinary and compelling reason for his release on home confinement. (Gov't Resp. at 13.) The Court agrees with the Government.

As the Court noted in *Feiling I*, in determining what constitutes "extraordinary and compelling reasons" for compassionate release, courts have considered related policy statements under the United States Sentencing Guidelines, though such statements are not binding. 2020 WL 1821457, at *7 (citing *United States v. Beck*, 425 F. Supp. 3d 573, 582 (M.D.N.C. 2019)). These policy statements provide that medical conditions can, alone, prove sufficiently extraordinary and compelling to justify a sentence modification. U.S.S.G. § 1B1.13, application notes 1(A)-(B), (D). However, to be extraordinary and compelling, an inmate's medical condition(s) must be "serious and advanced . . . with an end of life trajectory." § 1B1.13, application note 1(A)(i). Alternatively, an inmate's medical condition(s) must be serious enough that they "substantially diminish the ability of the [inmate] to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." § 1B1.13, application note 1(A)(ii).

Based on these principles, the Court finds that Defendant's medical conditions, alone, do not provide an extraordinary and compelling reason for his release on home confinement. For one, Defendant fails to establish that any of his conditions, either singly or in combination, are "serious and advanced . . . with an end of life trajectory." § 1B1.13, application note 1(A)(i). Instead, Defendant argues that the BOP's failure to provide the only FDA-approved medication

for his narcolepsy and its removal of his CPAP machine after he refused to go into isolation have substantially diminished his ability to provide self-care in the prison environment. (Def.'s 2d Mot. at 7.) The Court remains unconvinced.

Indeed, Defendant's own argument concedes that he could have access to a CPAP machine if he agreed to enter isolation. Defendant does not refute the Government's assertion that the BOP asked Defendant to enter isolation to protect him from COVID-19. Consequently, Defendant's voluntary decision to refuse further protections against COVID-19 prevented him from treating his sleep apnea. Defendant's refusal highlights both the uncompelling nature of his sleep apnea as a reason for his compassionate release — because Defendant clearly weighed his ability to use a CPAP machine in refusing to enter isolation — and Defendant's disinterest in protecting himself from COVID-19 within the prison system — because he clearly valued not being in isolation over the additional protections from COVID-19 that isolation would afford.

As for Defendant's narcolepsy with cataplexy, although the Court agrees that the BOP should take the appropriate steps to provide Defendant with his needed medication, the Court does not find that Defendant's ability to care for himself has been "substantially diminished" by his inability to take the most effective medication. Indeed, the Court's review of Defendant's medical records reveals that he has repeatedly exhibited normal psychomotor functioning and denied experiencing seizures, dizziness or other cataplectic symptoms. (Ex. 2 to Def.'s 2d Mot. ("Med. R.") (ECF No. 61) at 5, 7, 13, 15.) Importantly, the Court finds no confirmed instances of cataplectic episodes in the records provided, and Defendant denied experiencing either loss of consciousness or "significant injury" from any self-reported episodes. (Med. R. at 16.) To be sure, Defendant's condition would undoubtedly improve with the proper medication, but

Defendant has not shown that his narcolepsy with cataplexy has gone so untreated as to present an extraordinary and compelling reason for his release on home confinement.

### B. Defendant Fails to Present Extraordinary and Compelling Reasons for His Release Due to the COVID-19 Pandemic.

Defendant also argues for his release due to his susceptibility to COVID-19 and his particularized risk of contracting COVID-19 while in prison. (Def.'s 2d Mot. at 10-16.) Specifically, Defendant argues that he suffers from several COVID-19 risk factors, including advanced age, type II diabetes, hypertension, obesity and other heart issues. (Def.'s 2d Mot. at 10-16.) Defendant contends that these risk factors, alone, provide a compelling reason for his release. (Def.'s 2d Mot. at 16.) And Defendant adds that he has a particularized risk of contracting COVID-19, because FCI Loretto now has at least sixteen confirmed cases of COVID-19 among inmates and staff. (Def.'s 2d Mot. at 19-21.)

The Government responds that although Defendant suffers from several COVID-19 risk factors, he fails to establish a particularized risk of contracting the disease at FCI Loretto. (Gov't Resp. at 13.) The Government emphasizes that FCI Loretto continues to take appropriate steps to isolate inmates who test positive for COVID-19. (Gov't Resp. at 13-14.) And the Government urges the Court not to find Defendant at a particularized risk of contracting COVID-19 merely because FCI Loretto has a few confirmed cases. (Gov't Resp. at 13.) The Court agrees with the Government.

As the Court opined in *Feiling I*, "[i]n the context of the COVID-19 outbreak, courts have found extraordinary and compelling reasons for compassionate release when an inmate shows both a particularized susceptibility to the disease and a particularized risk of contracting the disease at his prison facility." 2020 WL 1821457, at *7 (citing *United States v. Dungee*, 2020 WL 1666470, at *2 (W.D. Va. Apr. 4, 2020); *United States v. Edwards*, __ F. Supp. 3d __,

14

2020 WL 1650406, at *5 (W.D. Va. Apr. 2, 2020)). To establish a particularized risk of contracting COVID-19, an inmate must first demonstrate that cases of COVID-19 have emerged at his facility. *Id.* Defendant has met this initial burden. However, the Court finds that COVID-19 and an inmate's susceptibility to it do not justify compassionate release when, as here, the inmate refuses additional protections afforded to him by the BOP without good cause and continues to voluntarily place himself in an environment in which he faces the highest risk of contracting the disease.

Indeed, as mentioned, the BOP has offered to place Defendant in isolation due to his medical conditions, further protecting him from COVID-19, but Defendant refused these protections to preserve his housing assignment. (Ex. 1 to Gov't Resp. (ECF No. 65) at 1.) The Court will not find Defendant to be at a particularized risk of contracting COVID-19 when he has placed himself in the position to be more at risk. Rather, an inmate must show that he remains at a particularized risk of contracting COVID-19 despite taking the reasonable precautions afforded to him by the BOP. To hold otherwise would encourage inmates to avoid options like voluntary isolation that will help reduce the spread of COVID-19 within the prison system in hopes that a court will find them at risk and release them, defeating the ultimate goal of both the BOP and the courts in helping stem the spread of COVID-19. And Defendant's decision to refuse isolation also undermines his argument that FCI Loretto has not taken sufficient steps to protect him from contracting COVID-19, for clearly prison officials have identified Defendant as an at-risk inmate and attempted to afford him greater protections.

Because Defendant has not shown that he remains at a particularized risk of contracting COVID-19 despite taking all of the reasonable precautions offered to him by the BOP, the Court finds Defendant's COVID-19 arguments without merit.

### C. Defendant Has Not Shown that His Wife is Incapacitated or that He Constitutes Her Only Available Caregiver.

Defendant also argues that he should be released to provide care to his ailing wife, who suffers from stage IV cancer of her liver, lungs and abdomen. (Def.'s 2d Mot. at 16.) Because Defendant's children cannot move from out of state to care for his wife, Defendant contends that he should be released on home confinement to support her. (Def.'s 2d Mot. at 16-17.) The Government does not respond directly to this argument, but notes that Defendant's release would increase his wife's risk of exposure to COVID-19, because Defendant's conditions of release and continued treatment will require him to meet in-person with several individuals. (Gov't Resp. at 14-15.) The Court agrees with the Government, though not only because Defendant's release would increase his wife's potential exposure to COVID-19.

Indeed, the Sentencing Guidelines provide for compassionate release only when an inmate's spouse is "incapacitat[ed]," and even then, the Guidelines require that an inmate "be the *only* available caregiver for the spouse." § 1B1.13, application note 1(C)(ii) (emphasis added). Here, Defendant fails to satisfy either requirement. For instance, although Defendant describes his wife's cancer as stage IV, he does not allege that she cannot care for herself such that she is incapacitated. *See United States v. Marshall*, 2020 WL 114437, at *3 (W.D. Ky. Jan. 9, 2020) (defining "incapacitated" based on BOP guidance as the inability to "carry on self-care"). In fact, Defendant acknowledges that his wife continues to receive chemotherapy without Defendant present, which indicates that she can care for herself using her current support system. (Def.'s 2d Mot. at 16.)

Likewise, although Defendant argues that his children cannot serve as caregivers, because they reside in other states and cannot afford to relocate to Richmond, Defendant has not established that his wife would be unable to live with one of the children after undergoing a

16

quarantine period. Neither has Defendant ruled out the existence of other caregivers who presumably are assisting his wife with her current treatment. Defendant bears the burden to establish compelling reasons for his compassionate release, and Defendant fails to meet that burden here.

### D. Even in Combination, Defendant's Proffered Reasons for His Release Do Not Prove Extraordinary or Compelling.

Defendant argues that his combined circumstances, as detailed above, provide an extraordinary and compelling reason for his release under the catch-all provision of the Sentencing Guidelines. (Def.'s 2d Mot. at 16.) Indeed, the Sentencing Guidelines contemplate situations in which an inmate's medical conditions, age, family circumstances and other circumstances, in combination, prove sufficiently compelling to justify compassionate release. § 1B1.13, application note 1(D). However, even in combination, Defendant's reasons for release on home confinement fail to meet this standard.

To be sure, Defendant's circumstances in combination prove more persuasive than each circumstance individually; nonetheless, the Court finds them insufficient to establish an extraordinary and compelling reason for Defendant's release. Indeed, for the reasons that each circumstance fails to persuade the Court individually, they fail to persuade the Court in combination. In fact, Defendant's refusal to enter isolation based solely on a desire to preserve his housing assignment leads the Court to draw the opposite conclusion: that Defendant does not seek release out of an overarching concern for his health and welfare, but simply to avoid the brunt of the sentence that the Court imposed after considering the § 3553(a) factors. Accordingly, the Court denies Defendant's Second Motion for Compassionate Release for his failure to present extraordinary and compelling reasons, either singly or in combination, for his release on home confinement.

17

### E. As in *Feiling I* and during Sentencing, the Court Finds that the § 3553(a) Factors Do Not Support Defendant's Release on Home Confinement.

The Court also finds that the § 3553(a) factors do not support Defendant's release on home confinement. Indeed, before granting a sentence modification under § 3582(c)(1)(A), a court must consider "the factors set forth in section 3553(a) to the extent they are applicable." To that end, the Court has twice rejected Defendant's arguments in favor of home confinement based on the § 3553(a) factors. First, the Court rejected Defendant's nearly identical arguments for home confinement during sentencing, finding that: (1) Defendant committed his instant offense while at home, meaning a term of home confinement would be less likely to protect the public; and, (2) Defendant's sentence needed to reflect the seriousness of his offense and the compelling public policy against the sexual exploitation of children. (SOR at 3.) And in denying Defendant's First Motion, the Court reiterated that Defendant's release on home confinement would undermine the relevant § 3553(a) factors. *Feiling I*, 2020 WL 1821457, at *8.

Although Defendant brings his instant Motion only four months after his First Motion and only eight months after starting his seventy-month sentence, he argues that a term of home confinement would satisfy the § 3553(a) factors, because: (1) he has already suffered shame, humiliation and other collateral consequences for his offense that will deter future conduct; and, (2) stringent limitations on Defendant's computer use while on home confinement will adequately protect the public. (Def.'s 2d Mot. at 24.) The Court remains unconvinced. Indeed, the Court already considered the collateral consequences of Defendant's conduct, including his shame and humiliation, in sentencing him to seventy months' imprisonment under the § 3553(a) factors. That Defendant has now served only eight months of that sentence does not alter the Court's analysis, and likely will not do so for the foreseeable future.

Moreover, although Defendant affirms that "stringent computer and location monitoring would adequately protect the public from any future offenses," (Def.'s 2d Mot. at 24), Defendant has extensive experience in information technology and has already used that experience to conceal his conduct, leaving the Court unpersuaded that Defendant would comply with any limitations on his computer use, (PSR ¶¶ 78, 80-81; Ex. 1 to Gov't Pos. on Sentencing ("ROI") (ECF No. 31-1) at 4). And although Defendant would reside with his wife, who could presumably monitor his computer use, Defendant's wife previously attempted to stop Defendant's conduct without success, which again leaves the Court unpersuaded that Defendant would not reoffend if released on home confinement. (ROI at 4.) During sentencing, Defendant also acknowledged that his conduct resulted from "inactivity and boredom," which would be inherent to any sentence of home confinement, further justifying his continued incarceration. (Def.'s Pos. at 4.)

Ultimately, even if extraordinary and compelling reasons exist for Defendant's compassionate release, the Court, in its discretion and after considering the relevant § 3553(a) factors, finds that a term of home confinement would not adequately protect the public, promote respect for the law, deter Defendant and others from engaging in similar conduct, or reflect the seriousness of Defendant's offense. Accordingly, the Court denies Defendant's Second Motion for Compassionate Release under the § 3553(a) factors.[4]

---

[4] In support of his Second Motion, Defendant raises several arguments regarding the practical viability of his release plan. (Def.'s 2d Mot. at 21-24.) However, because the Court finds home confinement unviable under the § 3553(a) factors, the Court need not address Defendant's additional arguments.

19

## III. CONCLUSION

For the reasons set forth above, the Court DENIES Defendant's Second Motion for Compassionate Release (ECF No. 58). An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

/s/
David J. Novak
United States District Judge

Richmond, Virginia
Dated: August 26, 2020